**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                    :

**TIMOTHY A. HUTCHINSON, individually and on**    :
**behalf of a class of all others similarly situated,**    :
                                                    :

                 **Plaintiff,**                     :

                                                      :

        **-against-**                   :    **12 Civ. 1073 (HB)**
                                                      :

**ANTONIO M. PEREZ, PHILIP J. FARACI,**    :    <u>**OPINION AND ORDER**</u>
**ANTOINETTE P. MCCORVEY, PRADEEP**    :
**JOTWANI,**                                              :
                                                      :

               **Defendants.**                 :
                                                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
**Hon. HAROLD BAER, JR., District Judge:**

       Before the Court is a motion to dismiss brought by Defendants Antonio M. Perez, Philip

J. Faraci, Antoinette McCorvey, and Pradeep Jotwani (collectively, "Defendants") against Lead

Plaintiff Bret S. Jones ("Plaintiff"). The Amended Complaint, filed by Plaintiff on behalf of all

persons who acquired Eastman Kodak Company ("Kodak") securities between January 26, 2011

and January 19, 2012 ("Class Period"), alleges that Defendants,[1] who are current executives of

Kodak, made false and misleading statements about Kodak's financial conditions in the one-year

period leading up to its bankruptcy filing in violation of Sections 10(b) and 20(a) of the

Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and SEC

Rule 10b-5, 17 C.F.R. § 240.10b–5.  For the reasons set forth below, Defendants' motion is

GRANTED. Plaintiffs' motion to strike Appendix B of Defendants' motion to dismiss is

DENIED.[2]

<b>Background</b>

       Once a global and commercial giant commanding 90% of film and 85% of camera sales

in the United States, Kodak failed in its effort to transform its film-based business into a

---

[1] Kodak is not a defendant in the case because it is currently in a bankruptcy proceeding.

[2] At the oral argument, I informed the Counsel that I had considered Appendix B. Oral Arg. Tr. 2:17-20 Sept. 27, 2012.

profitable alternative in the age of digital photography. Am. Compl. ¶ 13. Having spent the 1990s trying to catch up and restructure itself, Kodak launched a new strategy of digital transformation in 2004 under the leadership of Defendant Perez. *Id.* ¶¶ 14-15. This strategy was initiated in response to Wall Street's criticism of its dwindling cash reserves and profitability. *Id.* Kodak's transformation was to be partly funded by "patent monetization," i.e. income generated by intellectual property ("IP") licensing and sales. *Id.* ¶ 15. Defendant Perez has been Kodak's Chairman of the Board and CEO since April 2003. Defendant Faraci has been Kodak's President and COO since September 2007. Defendant McCorvey has been Kodak's CFO and Senior Vice President since November 2010. Defendant Jotwani has been Kodak's President of Consumer Digital Imaging Group, Chief Marketing Officer, and Senior Vice President since September 2010. *Id.* ¶¶ 8-11.

On January 24, 2011, two days before the Class Period began, an administrative law judge found against Kodak on a "highly anticipated" patent case.[3] *Id.* ¶ 15. Plaintiff alleges that Kodak, in response, "immediately embarked on a campaign to convince investors of the imminence of Kodak's transformation to a digital, profitable, sustainable company," an effort that continued until its bankruptcy filing a year later. *Id.* ¶¶ 16, 19-20. To support his position, Plaintiff points to various statements made by Kodak and Defendants Perez, McCorvey, and Jotwani in January and February of 2011, which affirmed the company's "ongoing digital transformation" and anticipated positive results in 2011 based on the 2010 results, and assured shareholders that Kodak had "sufficient financial resources" despite the naysayers. *Id.* ¶¶ 34-37, 40-43. Plaintiff alleges that such statements were false and misleading at the time they were made because Defendants "failed to disclose the true and material fact[]" that Kodak lacked adequate financial resources and that a significant portion of Kodak's cash balance was not available to fund the U.S. operations. *Id.* ¶¶ 39, 45.

As evidence of Kodak's deteriorating financial condition—which in turn eroded Kodak's negotiating leverage with respect to IP licensing and sales vis-à-vis deep-pocket technology companies—the Amended Complaint highlights the following events. *Id.* ¶ 20. On March 15, 2011, Kodak issued a press release disclosing a private placement raising $250 million, $50

---

[3] On June 30, 2011, the International Trade Commission affirmed the initial determination in part and remanded it in part, delaying the resolution well into 2012 because the case had to be reassigned after the original administrative judge's retirement. *Id.* ¶ 69(a).

million of which was used to repurchase outstanding debt. *Id.* ¶ 46.  On April 26, 2011, Kodak renegotiated their loan agreement and removed the negative covenant requiring a cash minimum of $250 million in the U.S. *Id.* ¶¶ 53(g), 108.  On April 28, 2011, Kodak reported a loss of $249 million in the first-quarter from continuing operations.  *Id.* ¶ 49.  Plaintiff alleges that Defendants failed to disclose that the above measures were taken because Kodak was "desperate for cash" and was "in jeopardy of default" by violating the minimum cash covenant; instead Kodak misleadingly characterized them as "opportunistic" and "tak[ing] advantage of improvements in the credit market." *Id.* ¶¶ 48(f), 53(g).  Plaintiff alleges that Defendants Perez and McCorvey, nonetheless, went on to misleadingly affirm the company's digital transformation by 2012 in the April 28, 2011, press release and earnings conference call, *id.* 51, and during the May 11, 2011, Annual General Meeting, where Defendant Perez again stated, "[W]e are committed to finish with [sic] this transformation in the year 2012.  And our strategy has not changed and we have the resources to execute it, fundamentally the IP and the sales of non-strategic assets is what fund our digital businesses." *Id.* ¶ 54.

On July 20, 2011, Kodak announced that it had engaged Lazard Freres & Co. LLC ("Lazard") because it was exploring the "strategic alternative[]" of selling its digital patent portfolio, estimated to be worth $2-3 billion. *Id.* ¶¶ 21, 58.  Plaintiff alleges that this announcement was yet again misleading because Kodak did not disclose that the new strategy was due to its desperation for cash and that Lazard had been hired "also for bankruptcy and restructuring counseling." *Id.* ¶ 60(f), (g).  Defendants Perez and McCorvey continued to express Kodak's commitment to digital transformation by 2012 and affirmed the prior projection of year-end cash balance in July. *Id.* ¶ 62.  *Bloomberg*, on August 30, 2011, reported Defendant Perez's statement that "a large number" of buyers were interested in the patent portfolio. *Id.* ¶ 66.  Plaintiff alleges that the above statements were misleading because Kodak had difficulty finding a buyer due to the concern that the purchase would be considered a fraudulent transfer if Kodak ever became insolvent.  *Id.* ¶ 69.

Still unable to execute the patent portfolio sale, Kodak announced on September 23, 2011, that it was drawing $160 million against its credit line, and the share price declined by 27% to $1.74 per share. *Id.* ¶¶ 72, 75.  A week later, the share price further declined to "an all-time closing low" of $0.78 per share when Kodak confirmed the news that it had hired Jones Day, a law firm known for bankruptcy restructuring. *Id.* ¶ 81.  Although Kodak commented that

it had "no intention" of filing for bankruptcy on that day, *id.* ¶ 82, and Defendant Perez publicly remained optimistic about its ability to sell the digital imaging patent portfolio as late as November 3, 2011, *id.* ¶ 86, Kodak finally announced on January 19, 2012, that it was filing petitions for Chapter 11 bankruptcy protection, *id.* ¶ 92.  Plaintiff alleges that since September 2011, Defendants issued false and misleading statements about Kodak's intention to file for bankruptcy since "[u]nbeknownst to investors, Kodak's liquidity had suffered a significant and critical decline." *Id.* ¶ 83(g).

Discussion

**A. Legal Standards**

To survive a motion to dismiss under Rule 12(b)(6), "the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  While a court must accept as true all of the factual allegations contained in the complaint, "the tenet . . .  is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).  The Court, at this stage, is not limited to the complaint but "may consider any written instrument attached . . .  statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI*, 493 F.3d at 98.

In addition, a complaint alleging securities fraud such as the one before this Court "must satisfy the heightened pleading requirements" of Rule 9(b) and the Private Securities Litigation Reform Act (the "PSLRA") "by stating with particularity the circumstances constituting fraud." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009).  Under Rule 9(b), plaintiffs alleging fraud must: (1) specify the statements that the plaintiff contends were fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent. Fed. R. Civ. P. 9(b). The PSLRA, in turn, requires the court to dismiss the complaint if it fails to: (1) specify each statement alleged to be false or misleading along with reason(s) why it is so; or (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b).

**B. Claims under Section 10(b) and Rule 10b-5**

Plaintiff alleges that Defendants' misrepresentations and omissions about Kodak's liquidity, IP licensing and sales, digital transformation, financial projections, and bankruptcy artificially inflated the stock prices and are thus actionable under Section 10(b) of the Exchange Act.  Under that provision, it is unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b).  Rule 10b-5, in turn, defines "employment of manipulative and deceptive devices" to include, inter alia, "mak[ing] any untrue statement of a material fact or [] omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b).  To state a claim under Section 10(b) and Rule 10b-5, Plaintiff must allege that defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005).

**1.  Scienter**

I begin my analysis by examining Plaintiff's allegations of scienter, since Plaintiff has agreed that the Amended Complaint relies exclusively on the theory of recklessness. Oral Arg. Tr. 30:13-14 Sept. 27, 2012; *see also* Pl.'s Supp. 15.  As discussed above, the PSLRA requires the Court to dismiss the complaint if the alleged facts do not give rise to "a strong inference" of Defendants' scienter. 15 U.S.C. § 78u–4(b)(2)(A), (3)(A).  "Therefore, while we normally draw reasonable inferences in the non-movant's favor on a motion to dismiss, the PSLRA establishes a more stringent rule for inferences involving scienter . . . [and] requires particular allegations giving rise to a strong inference of scienter." *ECA*, 553 F.3d at 196 (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008)) (internal quotation marks omitted). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makors Issues & Right, Ltd.*, 551 U.S. 308, 324 (2007).  A plaintiff may satisfy the scienter requirement by alleging facts that either: (1) show that the defendants had both motive and opportunity to commit the fraud; or (2) constitute strong circumstantial evidence of conscious misbehavior or recklessness. *ATSI*, 493 F.3d at 99

(citation omitted).  The Second Circuit has stated that if plaintiffs do not allege facts supporting a motive, the circumstantial evidence of recklessness or actual knowledge "must be correspondingly greater." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 776 (2010).

Recklessness in this Circuit has been defined as "conduct which is highly unreasonable" and which represents "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).  "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Id.*  However, "such an allegation must specifically identify the reports or statements containing this information." *Inter-Local Pension Fund GCC/IBT v. Gen. Elec. Co.*, 445 F. App'x 368, 370 (2d Cir. 2011) (quoting *Novak*, 216 F.3d at 309) (quotation marks omitted).  The Second Circuit has also identified "several important limitations . . . based on reckless conduct," two of which are relevant to this case. *Novak*, 216 F.3d at 309.  First, "'fraud by hindsight' . . . allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Id.*  Second, "as long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects." *Id.*

Based on the Circuit's clear instruction that an allegation based on recklessness "must specifically identify the reports or statements" containing the contradictory information, *Novak*, 216 F.3d at 309, Plaintiff  principally relies on the declarations submitted by Lazard and Defendant McCorvey for Kodak's bankruptcy proceedings (together "Bankruptcy Declarations") which purportedly show that "defendants had knowledge of, or access to, facts directly contravening their public statements during the Class Period." Pl.'s Opp. 16-20.  While these declarations show that the company's financial position was increasingly precarious during the Class Period, they do not, so far as I can see, show that Defendants had knowledge of or access to contradictory facts.  First, there is nothing in the Bankruptcy Declarations that supports Plaintiff's contention that "defendants were positioning Kodak for reorganization by as early as July 2011 and, in any event, no later than September 12, 2011." Pl.'s Opp. 17.  Rather, the Lazard Declaration, on which Plaintiff relies for the above allegation, clearly states that Kodak initially engaged Lazard "[o]n July 13, 2011. . . to advise them with respect to a potential sale of

their digital imaging patent portfolio" Baig Decl. Ex. 2, ¶ 11.  Thus it is unlikely that Defendants misled investors in July by failing to disclose that Lazard had been hired for bankruptcy and restructuring counseling. Am. Compl. ¶ 60(b).  Second, while Lazard's engagement was subsequently "expanded" on September 12, 2011, "to encompass a variety of possible . . . alternatives, including, if necessary, a restructuring through chapter 11," the Declaration unequivocally states that Lazard actively assisted Kodak in exploring non-bankruptcy alternatives in the following months, including "[o]ne such alternative, which was announced publicly and pursued for several months . . . to supplement or replace the Debtors' [Kodak's] $400 million prepetition asset-based revolving credit facility ("ABL") with incremental prepetition first lien financing of up to $500 million." *Id*. ¶¶ 11, 12.  It was only after Kodak had learned that "for a variety of reasons, such a transaction could not be arranged in an amount that would have provided adequate assurances that a chapter 11 filing could be avoided" and had gained "significant insight into what . . . [its] financing options might be" that Kodak authorized Lazard on December 8, 2011, to initiate the process of securing financing for a potential Chapter 11 filing. *Id*. ¶¶ 12.  At most, the statements above show that Kodak began to consider bankruptcy as an option among others in September while at the same time it pursued other alternatives to avoid it, but they do not contradict Defendants' statement in September that Kodak had "no intention" of filing for bankruptcy or Defendant Perez's "optimism" in early November about Kodak's ability to sell digital imaging patent portfolio. Am. Compl. ¶¶ 82, 86.

Neither do the Bankruptcy Declarations support Plaintiff's contention that Defendants knew or had access to contrary information that would make their optimistic statements about patent licensing and sale, digital transformation, and cash position "reckless" at the time they were made.  The only "contradictory" information that Plaintiff offers is Defendant McCorvey's general statements that the 2008 financial crisis "continued to negatively impact the Company's liquidity position" and "resulted in slower growth" in Kodak's consumer inkjet business, while "the Company has faced difficulties executing the [patent portfolio] sale due to uncertainty about its financial conditions."  Baig Decl. Ex. 1, ¶¶ 10, 37, 40, 41.  These statements describe Kodak's mounting difficulties since 2008 and explain why it was ultimately unable to sell its patent portfolio in time to prevent bankruptcy, but they do not contradict Defendants' statements regarding Kodak's ability to achieve digital transformation during the Class Period. *See Inter-Local Pension Fund GCC/IBT*, 445 F. App'x at 370 (finding no strong inference of scienter

because the defendants' "awareness of *general* unspecified market risk does not contradict any of their public statements about the Company's financial prospects" and because plaintiffs failed to allege that defendants were "aware of those risks *at the time* of their public statements . . . such that their statements were not consistent with reasonably available data") (emphasis added). Instead, the same declaration shows that Defendants had good reasons to be optimistic in 2011 about Kodak's ability to fund and complete its digital transformation, since "[f]rom 2003 to 2010, the Company negotiated approximately $3.0 billion of licensing revenue from its digital capture patent portfolio," and even after its bankruptcy filing, "[t]he Company [continued to] anticipate[] substantial future revenue from licensing its intellectual property" and "expect[] that these [patent] lawsuits, once resolved, w[ould] benefit Kodak's stakeholders substantially." *Id.* ¶¶ 8, 41. "Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them." *Novak*, 216 F.3d at 309.

Plaintiff's remaining allegations of scienter, examined below, do not cure the Amended Complaint's basic failure to allege that "(1) *specific* contradictory information was available to the defendants (2) *at the same time* they made their misleading statements." *In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009), *aff'd sub nom. Condra v. PXRE Group Ltd.*, 357 F. App'x 393 (2d Cir. 2009) (citation omitted) (emphasis in original). According to the Second Circuit, "[m]otives . . . generally possessed by most corporate directors and officers," such as "the desire for the corporation to appear profitable and . . . the desire to keep stock prices high to increase officer compensation," do not suffice. *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (internal quotation marks omitted). Thus, Plaintiff's allegations of Defendants' motive "to misrepresent the company's viability," Am. Compl. ¶ 101, or "to conceal . . . available cash . . . in banks in the U.S., to ensure that they would not precipitate an event of default under loan covenants," *id.* ¶ 106, as well as an allegation based on "individual defendants' compensation packages," *id.* ¶ 120, are insufficient, and Plaintiff has wisely abandoned the motive theory in its brief and during oral argument. Similarly, the courts in this district have held that "the size of the fraud alone does not create an inference of scienter," and an allegation based on Kodak's year-end balance of just over $800 million rather than forecasted $1.3-1.8 billion must therefore fail. *In re PXRE*, 600 F. Supp. 2d at 545 (citation omitted). Finally, without sufficiently alleging the requisite fraudulent intent first, Plaintiff cannot rely on the mere fact that Defendants Perez and McCorvey signed certifications under Sarbanes-Oxley

Act of 2002, and allegations that Defendants "violated" disclosure requirements under GAAP and Kodak's Business Conduct Guide to support recklessness. Am. Compl. ¶¶ 111, 137, 142. *See In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 448 (S.D.N.Y. 2005) (rejecting plaintiffs' "circular" argument "that the violations [of GAAP or internal accounting policies] themselves, without allegations of knowledge or recklessness, indicate that the Individual Defendants acted with *scienter*"); *see also Novak*, 216 F.3d at 309 ("[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim" without evidence of corresponding fraudulent intent.); *In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 590 (S.D.N.Y. 2010) (finding defendants' signature on SEC disclosures and Sarbanes–Oxley certificates "insufficient to support a strong inference of recklessness in the absence of more particularized allegations").

Based on the alleged facts, the more compelling "plausible, nonculpable" explanation is that Defendants failed to avoid Kodak's bankruptcy in January 2012 despite their best efforts to fund and complete a successful digital transformation throughout 2011. *Tellabs,* 551 U.S. at 324. This inference is consistent with Kodak's performance in 2010, the potential, albeit unrealized, value of the company's IP licenses and sales, as well as Kodak multiple efforts to fund itself despite the negative developments in 2011.  This inference is further supported by Kodak's numerous qualifications during the class period about its cash position and digital transformation since the beginning of the Class Period, such as the Form 10-K for 2010, filed in February 2011, warning that "[o]ur significant debt and debt service requirements could adversely affect our ability to operate our business" and "our business may not generate cash flow in an amount sufficient to enable us to pay the principal of, or interest on, our indebtedness, or to fund our other liquidity needs." Conn Decl. Ex. B, at 15.  "Limitations or restrictions on the repatriation of cash," *id.* Ex. C at 16, and "uncertainty relating to the Company's intellectual property licensing activities with Apple, Inc. and Research in Motion Ltd. pending the outcome of the infringement litigation against these companies before the International Trade Commission" were also disclosed throughout the Class Period, *id*. Ex. P, at 37. Towards the end of the Class Period, Kodak provided stark warnings on the Form 10-Q, filed in November 2011, that "[t]he Company's ability to continue its operations . . . within the next twelve months is dependent upon the ability to monetize its digital imaging patent portfolio through a sale or licensing of the relevant patents and/or the successful execution of the alternative actions" and that "as of

September 30, 2011 cash balances held outside of the U.S. are generally required to support local country operations and are therefore not available for operations in other jurisdictions." *Id*. Ex. S, at 47.

This case is therefore analogous to a host of cases in which courts have dismissed, as "fraud in hindsight," complaints filed after a company's bankruptcy based on the conclusory allegation that defendants had or should have been aware of the "liquidity crisis." *See*, *e.g.*, *Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004) (rejecting a complaint pleading conscious or reckless misbehavior based on "a liquidity crisis during the relevant period" because "Plaintiffs do not allege facts and circumstances that would support an inference that defendants knew of specific facts that are contrary to their public statements"); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) (rejecting the technique of "record[ing] statements by defendants predicting a prosperous future and hold[ing] them up against the backdrop of what actually transpired" unless Plaintiff "allege[s] that the company's disclosures were incompatible with what the most current . . . reports showed at the time the disclosures were made"); *Gissin v. Endres*, 739 F. Supp. 2d 488, 513 (S.D.N.Y. 2010) (rejecting plaintiff's allegation of recklessness by "posit[ing] that defendants were aware of the extent of . . . liquidity problems" based on the failure to plead defendant's access to contrary information). I also note that Plaintiff does not allege any restatement of Kodak's financial statements or refer to any confidential witnesses, Oral Arg. Tr. 9:9, 12 Sept. 27, 2012, or the existence of any other report, and consequently, the complaint is also easily distinguishable from the complaints that survived a motion to dismiss on those grounds. *See*, *e.g.*, *Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 482 (S.D.N.Y. 2010) (finding sufficient pleading of conscious behavior or recklessness based on "specific reports or documents" and "an admission"); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 488, 493 (S.D.N.Y. 2004) (finding the allegation of recklessness "sufficient when combined with the inference created by the restatement" and identification of "confidential witnesses").

In the bankruptcy context, there are serious policy reasons why courts should carefully evaluate a plaintiff's fraud allegations.[4]  As another court in this district recently remarked,

---

[4] "'Fully informed securities markets aren't the only goal in this world,' said Adam Pritchard, a University of Michigan law professor and former SEC attorney. 'If disclosure is destroying businesses, well, how is that good for anyone?'" Mike Spector, *Keeping Mum About the 'B Word'*, The Wall Street Journal, Nov. 8, 2011.

"Such an outcome is further supported by the public policy justifications for allowing a company operating near insolvency to make careful deliberations about its future, free from any obligation to disclose potential bankruptcy." *Beleson v. Schwartz*, 599 F. Supp. 2d 519, 527 (S.D.N.Y. 2009), *aff'd*, 419 F. App'x 38 (2d Cir. 2011) (citing *In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327, 348 (S.D.N.Y. 2007) ("No multi-billion dollar company would file for bankruptcy without first engaging in internal deliberations regarding its course of action.")).

### 2. Material Misstatements and Omissions

Since the Court must dismiss the Amended Complaint if Plaintiff fails to adequately plead scienter, I need not reach loss causation or misleading statements and omissions under the PSLRA. Nonetheless, I note that many of Plaintiff's alleged statements, especially those regarding Kodak's digital transformation by 2012 and financial projections for 2011, are forward-looking statements squarely protected by the "safe harbor" provision of the PSLRA. *See* 15 U.S.C. § 78u-5(i)1(A),(B). "The safe harbor is written in the disjunctive; that is, a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *Slayton*, 604 F.3d at 766 (emphasis in original) (citation omitted). Since Plaintiff fails to sufficiently allege even recklessness, the fate of such statements is clear. "[B]ecause the safe harbor specifies an actual knowledge standard for forward-looking statements, the scienter requirement for forward-looking statements is stricter than for statements of current fact. Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity." *Id.* at 773 (citation and internal quotation marks omitted).

Furthermore, many of Defendants' statements alleged to be false and misleading—such as "[T]his is not a beaten down company" and "I am confident that we will continue to achieve market success, complete our transformation into a sustainable, profitable company, and create significant value of our shareholders," Am. Compl. ¶¶ 42, 43—are statements of corporate optimism and puffery "too general to cause a reasonable investor to rely upon them." *ECA*, 553 F.3d at 206.

### Conclusion

I have considered the parties' remaining arguments and find them to be without merit. Having failed to sufficiently plead a primary violation, Section 20(a) claim must likewise be

dismissed. *See Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 170 (2d Cir. 2000) ("To make out a prima facie case under § 20(a) of the Exchange Act, a plaintiff must show a primary violation . . . by the controlled person . . . .") (citation and quotation marks omitted). For the foregoing reasons, Defendants' motion to dismiss is GRANTED. Plaintiff's motion to strike Appendix B of Defendants' motion to dismiss is DENIED. The Clerk of the Court is instructed to close the two motions and remove the case from my docket.

**SO ORDERED.**

**New York, New York**
**November 8, 2012**

**Hon. Harold Baer, Jr.**
**U.S.D.J.**

12